## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

ARNETTA McCLOUD et al.,

       Plaintiffs,

v.                                      CASE NO.  4:05cv101-RH/WCS

KENNETH W. FORTUNE, etc.,
et al.,

       Defendants.

_____/

## ORDER DENYING MOTION FOR NEW TRIAL OR REMITTITUR

This §1983 action arises from the prolonged detention of a family of four following a traffic stop on a remote highway after midnight by law enforcement officers who had evidence that the father made a drug sale earlier in the evening. The father (who was driving) readily consented to a search of the car, and officers conducted a thorough search (including with a dog).  They found nothing.  Officers held the father and the other family members for nearly three hours after the conclusion of the search of the car, releasing them shortly after 4:00 a.m.  Holding the family members (other than the father) after completion of the search of the car was lawful if and only if they consented.  After a full and fair trial, the properly

instructed jury found that they did not consent and awarded both compensatory and

punitive damages.  Defendants have moved for a new trial or alternatively for

remittitur of the punitive damages awards.  Because the verdict was fully

consistent with the weight of the evidence and the jury's assessment of damages

was reasonable, I deny the motion.

# I.
## Facts[1]

The McCloud family consists of father Freddy McCloud, mother Arnetta

McCloud, daughter Cynthia McCloud (age 15 at the time of the events at issue),

and nephew (and ward) Marcus Frazier (age 16 at that time).  This order sometimes

refers to the four family members collectively as "the McClouds" and to the three

family members other than Mr. McCloud (that is, to the three plaintiffs in the jury

trial) as "plaintiffs."  The McClouds live in south Florida.

On July 10, 2001—Mrs. McCloud's birthday—the McClouds traveled in a

white Lincoln owned by Mrs. McCloud's father to visit Mrs. McCloud's sister

Barbara King and her family at their home near Monticello, a small city in

Jefferson County in the Florida panhandle.  The day's activities included a family

---

[1] The jury returned its verdict in favor of plaintiffs.  To the extent consistent with the weight of all of the evidence on both sides, the facts are set forth here in the light most favorable to plaintiffs, as appropriate in considering a motion for new trial.  *See Rosenfield v. Wellington Leisure Products, Inc.*, 827 F.2d 1493, 1498 (11th Cir. 1987).  Disputes of significance are noted, usually in footnotes.

cookout.  The McClouds planned to leave late that evening to travel to Tallahassee, 25 miles to the west, to the home of Mrs. McCloud's other sister, who also had attended the cookout at the King residence.

Also on July 10, 2001, a confidential informant told his cousin, an officer with the Monticello police department, that "Freddy" had ounces of cocaine for sale for $900.  The officer, David Norton, brought the information to Jefferson County deputy sheriff William D. Hayes.  Officers Norton and Hayes used the informant to arrange a controlled buy of half an ounce of cocaine for $450.  The reason for buying half an ounce, rather than an ounce, was financial; the officers did not want to spend (and risk losing) $900.

The controlled buy went forward at about 10:00 p.m.  After searching the informant, the officers dropped him off with $450 near the location where he said cocaine could be purchased—as it turns out, the King residence.  The officers monitored events by audio transmitter and made an audiotape.  Nothing in the audio transmission confirmed what occurred or who was involved.  The informant did, however, return with half an ounce of cocaine and without the officers' $450. The informant told the officers he bought the cocaine for $450 from Mr. McCloud, exactly as planned.[2]  The officers had no reason to doubt the informant's report.

---

[2] It is not completely clear whether the informant identified the seller only as "Freddy" or also provided a last name, but there is no evidence that any "Freddy" other than Mr. McCloud was at or near the King residence at the time.  Because the

They sent the informant back to try to obtain further information, and he returned

saying Mr. McCloud would be traveling to Tallahassee later that night in a white

Lincoln.  The informant did not say how he knew this.  The informant may or may

not also have said that Mr. McCloud would be taking cocaine to Tallahassee, but

Mr. Hayes, at least, thought he would be.[3]

Mr. Hayes issued a BOLO ("be on the lookout") to Jefferson County

deputies, intending to have the Lincoln stopped (and if possible searched) en route

to Tallahassee.  The goal was to find Mr. McCloud in possession of cocaine and to

---

seller's identity matters only on the issues of reasonable suspicion or probable
cause, and because there was reasonable suspicion and indeed probable cause to
believe the "Freddy" to whom the informant referred was Mr. McCloud, it makes
no difference whether the informant provided the last name.  For convenience, in
this order I refer to the seller as identified by the informant as "Mr. McCloud."

[3] Mr. Hayes testified variously that the informant said Mr. McCloud "had at
least *another half ounce* of cocaine that he was leaving to go to Tallahassee with"
(Hayes tr., document 207, at 26 (emphasis added)) or that the informant said "there
would be *a large amount* of cocaine in the white Lincoln, and it would be going
back to Tallahassee to be sold."  (Hayes tr., document 207, at 16 (emphasis
added).)  In his written report Mr. Hayes said that the informant said Mr. McCloud
would be traveling to Tallahassee to sell "*some* cocaine."  (Def. ex. 3F (emphasis
added).)  Mr. Norton testified, however, that he was in the same car with Mr.
Hayes when the informant was debriefed and that the informant did *not* say there
was another half ounce (or any other amount).  Mr. Norton testified further that
officers had no information linking drugs to the car—a description inconsistent
with Mr. Hayes's version of the informant's report.  The informant prepared a
written report months later that was not introduced into evidence at the trial (but
was in the summary judgment record); that report says the informant told the
officers Mr. McCloud would be going to Tallahassee, but the report does *not* say
the informant told the officers Mr. McCloud would be taking drugs to Tallahassee.
*See* document 109, attachment 7.

effect an arrest without disclosing the existence or identity of the confidential informant.

Jefferson County deputy sheriff Gerald Knecht, who was in a marked vehicle, spotted the white Lincoln on a remote highway at about 12:30 a.m. (now early morning on July 11, 2005). The car turned west (toward Tallahassee). Although Mr. Knecht did not know it at the time, Mr. McCloud was driving, and plaintiffs were passengers. The Lincoln was traveling at or below the posted speed limit when Mr. Knecht first saw it, but Mr. McCloud failed to slow rapidly enough as he entered a reduced speed zone approaching the intersection where he turned. Mr. Knecht clocked the car at 49 miles per hour in a 35 zone.[4]

Mr. Knecht activated his vehicle's videotape recorder and, moments later, his flashing lights. Mr. McCloud promptly pulled over. Mr. Knecht told Mr. McCloud he had been speeding. At 12:33 a.m. Mr. Knecht told Mr. McCloud he would call in the stop and that if everything came back okay, Mr. McCloud would be given a verbal warning and allowed to go. Mr. Knecht told the McClouds to

---

[4] Plaintiffs all testified that they saw the marked patrol car and told Mr. McCloud to watch his speed. They testified that Mr. McCloud said he was not speeding. Mr. McCloud did not testify, however, and there is no evidence that he actually knew how fast he was traveling or what the speed limit was. And even if Mr. McCloud was not in fact speeding, the explanation might be simply that Mr. Knecht's clocking was incorrect. At least for present purposes, I accept as true Mr. Knecht's testimony that he clocked the car in excess of the speed limit.

remain in their car.[5]

Mr. Knecht returned to his own car and communicated by telephone or radio with Mr. Hayes (who was in charge) and other officers.  By 12:35 Mr. Knecht received a response from dispatch verifying Mr. McCloud's driver's license information.  At 12:36 the officers decided that Mr. Knecht should remain in his car until other officers arrived in the area, and that some officers (and their cars) would stay out of sight, in order not to "spook" the McClouds.  At 12:38 a second marked car (driven by Jefferson County deputy sheriff George Stinson) arrived at the scene.  Also at 12:38 Mr. Knecht approached the McCloud vehicle again and asked for permission to search the car.  Mr. McCloud promptly gave consent.  Mr. McCloud was "calm and cooperative" and "didn't even hesitate in giving consent."[6]

Mr. Stinson and Jefferson County deputy sheriff David Clark, who arrived separately, searched the McCloud car and found nothing.  There were no drugs in the car.  At 12:48 Mr. Stinson walked his drug dog around the car.  The dog went inside both the passenger area and the trunk.  According to Mr. Stinson, the dog

---

[5] These facts and those in the paragraphs that follow are taken from the testimony and the videotape that is in evidence as plaintiff's exhibit 4A.  The videotape included a running clock, providing the time of the recorded events.

[6] This was Mr. Knecht's description as given to Mr. Hayes (and recorded on the videotape) later that night.  (Pl. ex. 4A, July 11, 2001, at 1:13 a.m.)  The videotape of Mr. McCloud's consent confirms the description:  he was calm and cooperative and did not hesitate in giving consent.  (*Id.*, at 12:38 a.m.)

alerted to the trunk and did not alert anywhere else.

According to Mr. Stinson, the dog also slowed to sniff, thus exhibiting a "change of behavior"—not an alert—near the left rear passenger seat, where Cynthia McCloud had been sitting.  Mr. Stinson made no claim that this indicated drugs ever had been in that area, but he did say that such a "change of behavior" gives officers a "place to look."

There were left over hot dogs from the cookout in the trunk.  Although Mr. Stinson testified at trial that the drug dog was not affected by the hot dogs, Mr. Stinson can be heard on the videotape saying, "I know she wants those fucking hot dogs."[7]

In any event, after the dog did whatever she did, Mr. Stinson put her back in his vehicle, and the officers thoroughly searched the car again, concentrating on the trunk and the rear passenger area.  Again they found nothing.  At 1:04 Mr. Stinson got the dog out again and led her around the car again.  Officers continued to search.

By 1:09 the search of the car was over, and Mr. Stinson again put the dog away.  At 1:10 one of the officers whispered (apparently to ensure he was not heard by the McClouds) that drug dealers sometimes put drugs on females at the time of a traffic stop.  An officer said (incorrectly) that the dog had alerted to the

---

[7] Pl. ex. 4A, July 11, 2001, at 1:10 a.m.

back seat on the driver's side, where Cynthia McCloud had been sitting.  An officer said, "We can't go up there and grab her damn boobies."[8]  At 1:11 Mr. Knecht pointedly told Mr. Hayes—who was still parked down the road out of sight—that it was time to make a decision.  Mr. Hayes said the McClouds could lawfully be detained and ordered their detention.  At 1:12 an officer said they were going to have to find a female to search the women.

The officers locked Arnetta and Cynthia McCloud in the backseat of Mr. Knecht's patrol car and locked Mr. McCloud and Mr. Frazier in the backseat of Mr. Clark's car.  Mr. McCloud said unequivocally that they did not want to be put in patrol cars but that they wanted instead to leave.  At 1:14 an officer—apparently Mr. Stinson—responded that it was not a question of "want to"; he said the McClouds were being lawfully detained.

As part of the discussion of what to do, the officers realized that nobody had searched Mr. McCloud himself to determine whether he had the $450.  A search of Mr. McCloud's person turned up $226 in currency in one pocket, and $450 in another.  Officers also searched Mr. Frazier and found nothing.

At 1:18 Mr. Stinson told Mr. Knecht to turn off the audio portion of the videotaping equipment.  The reason apparently was so that, without being heard by the detainees in Mr. Knecht's vehicle, officers could compare the serial numbers

---

[8] Pl. ex. 4A, July 11, 2001, at 1:10 a.m.

from the seized $450 to those from the controlled buy.  The numbers matched.[9]

If anything meaningful happened between 1:18 and 1:47, this record does not reflect it.  For all this record shows, the officers simply held the McClouds in the backseats of two patrol cars and did nothing.  It is possible that during this time the officers were awaiting the arrival of Jefferson County under-Sheriff Michael Joyner, who would arrive later (by 1:53) and take charge.  At some point Mr. Clark told the McClouds that "the Major," a reference to Mr. Joyner, would decide how the rest of their night would go.

At 1:47 someone placed a call to the Leon County Sheriff's Department asking for the assistance of a female deputy.  (Pl. ex. 3.)  The county line between

---

[9] The only report of the night's events was written by Mr. Hayes.  At least two explanations for this were given:  first, that the only reason for writing a report is to provide any needed information to the state's attorney, and second, that reports are written on traffic stops only when something out of the ordinary happens, and nothing out of the ordinary occurred here.  Mr. Hayes's one-page report made no mention of finding any currency on Mr. McCloud.  Nor did the report say that serial numbers were recorded at the time of the controlled buy or matched any currency found on Mr. McCloud.  Mr. Hayes says that when a decision was made not to arrest Mr. McCloud that night (in order not to disclose the existence and identity of the confidential informant), officers returned the currency to Mr. McCloud, and Mr. Hayes threw away the piece of paper on which he had recorded the serial numbers.  This makes little sense.  Even when an immediate arrest is not made, officers routinely save evidence of drug dealing for use in any later prosecution.  There was no reason not to save the serial numbers here, and even less reason not to document the fact that currency was found on Mr. McCloud that matched.  Still, I assume for purposes of this order that officers did indeed find $450 in currency on Mr. McCloud and that the serial numbers matched those of the bills used in the controlled buy.

Jefferson and Leon Counties was not far from the scene of the stop, and Leon County—where Tallahassee, the largest city in the area, is located—was the jurisdiction most likely to have an available female officer on duty.   At 1:51 the Leon County dispatcher instructed deputy Pat McLeod and his trainee Evelyn Anderson, who were on patrol, to report to the scene.   (*Id*.)   The explanation was that Jefferson County deputies needed a female officer to search a female.

At 2:02, for reasons not explained, Mr. Knecht turned off the videotape.[10] At about that time, Mr. Joyner took Mrs. McCloud out of Mr. Knecht's car, and soon thereafter he took Cynthia out of the car, insisting they tell him what he wanted to know.   Mr. Joyner yelled and cursed.   He told Cynthia that if she did not tell him what he wanted to know, her parents would go to jail, and she would go to a children's home.   Mr. Joyner said he was tired of "you niggers" coming up here bringing dope."[11]   Mr. Joyner (and all of the other officers involved in the night's events) are white.   The McClouds are African American.

At 2:12 (*see* pl. ex. 3) the Leon County officers—Mr. McLeod and Ms.

_____

[10] Mr. Knecht testified he turned off the videotape just before officers left the scene, but in fact they left nearly 30 minutes later, as shown by other evidence, including Leon County dispatch records and testimony regarding the sequence and duration of events after Mr. Joyner's arrival.

[11] These facts are taken from the eyewitness testimony of Arnetta and Cynthia McCloud but are disputed.   Mr. Joyner denied yelling, making racial remarks, or being abusive.   Other officers backed him up on this point.   A reasonable juror could have credited either version.

Anderson—arrived at the scene.  Mr. Joyner advised Ms. Anderson (either directly

or through Mr. McLeod) that the McCloud women were to be searched for drugs.[12]

Ms. Anderson took Mrs. McCloud a short distance away—near the back of Mr.

Knecht's car—and conducted a search.  Ms. Anderson neither asked for nor

received consent, nor did any other officer.  Ms. Anderson felt Mrs. McCloud's

breasts through her outer clothing and bra.  Ms. Anderson inserted her hand down

Mrs. McCloud's pants and inside her underwear in the vagina area.[13]  Ms.

Anderson brought Mrs. McCloud back to the group and told Mr. Joyner that Mrs.

McCloud was clean, that is, that she had no drugs.

     Ms. Anderson then took Cynthia McCloud to the back of Mr. Knecht's car.

Ms. Anderson told Cynthia to empty her pockets, and she did, producing money

---

[12] Ms. Anderson says she was also told to search for weapons, but no other officer said this.  To the contrary, other officers acknowledged they had no concern that the women were armed or posed any threat to officer safety.  By that point, the McCloud women had been detained for more than an hour and a half, sometimes locked in the back of a patrol car but otherwise unattended.  Had they been inclined to shoot their way out, they presumably would long since have done so.

[13] Ms. Anderson denies putting her hand inside Mrs. McCloud's pants, but Mrs. McCloud insists she did; indeed, Mrs. McCloud says Ms. Anderson scratched Mrs. McCloud's vagina.  The jury was free to credit Mrs. McCloud's account, especially in light of the apparent contradiction between the assertion that a female officer was needed, on the one hand, and the assertion that only a brief external pat down was requested or conducted, on the other hand.  As Mr. Stinson acknowledged, male Jefferson County deputies routinely pat down females; he has done so many times.  (Stinson tr., document 209, at 20, 54-55.)  This hardly seems surprising.  The purpose of a pat down, after all, is to check for weapons that might be used to harm the officer.  By the time a female officer can be summoned, it might well be too late.

and her driver's license.  Ms. Anderson told Cynthia to put her hands on the car
and spread her legs.  Cynthia complied.  Ms. Anderson patted her down, finding
nothing.  Ms. Anderson neither asked for nor received consent, nor did any other
officer.  As Ms. Anderson was conducting the search, Cynthia said she was
menstruating.  Cynthia provided this information so that, if Ms. Anderson felt her
menstrual pad, she would know what it was.  Ms. Anderson brought Cynthia back
and advised the officers that she was clean.  Mr. Joyner told Ms. Anderson
(incorrectly) that the dog had alerted to the location where Cynthia McCloud had
been seated.  Mr. Joyner told Ms. Anderson to check her again.

Ms. Anderson again took Cynthia McCloud to the back of Mr. Knecht's
vehicle.  Ms. Anderson instructed Cynthia to take down her pants.[14]  Cynthia
pulled down her pants, including her underwear, and showed Ms. Anderson her
menstrual pad.  Whether any of the officers other than Ms. Anderson saw her pull

---

[14] Ms. Anderson testified that she did not *instruct* Cynthia McCloud to take
down her pants.  Ms. Anderson testified that Cynthia said again that she was on her
period, and that in response, Ms. Anderson said only words to the effect of, "Do
you want to show me?"  Ms. Anderson says this was not an instruction.  Cynthia
testified unequivocally that she was told to take down her pants and would not
otherwise have done so.  A reasonable juror could have credited Cynthia's
testimony.  And if a juror credited Ms. Anderson's testimony that she said only,
"Do you want to show me?", the juror still could conclude that this was, in effect,
an instruction.  The suggestion that a 15-year-old girl voluntarily took down her
pants alongside a public highway to show a deputy sheriff that she was
menstruating seems farfetched.  So does the suggestion that a female officer was
summoned from the next county just to talk or conduct an unintrusive pat down.

down her pants, and whether any cars passed while this occurred, are disputed.  It is undisputed, however, that Cynthia McCloud pulled down her pants and underwear alongside a public highway in the immediate presence of a female officer and a short distance away from a number of male officers and her mother, father, and cousin.

Ms. Anderson returned Cynthia to Mr. Knecht's car and reported that she was clean.  Cynthia was visibly distressed.  The Leon County deputies left the scene at 2:29.  (Pl. ex. 3.)

Mr. Joyner decided to take the McClouds back to the King residence and search the home.  He commandeered the McCloud vehicle, requiring Mrs. McCloud to ride along as he drove.[15]  Mr. Joyner made abusive remarks, including, for example, that his ancestors had owned hers, and that he would put all the McClouds' "black asses in jail."  Mrs. McCloud said Mr. Joyner would need a search warrant, but Mr. Joyner responded that he needed nothing, because, he said, "I'm the police."  Mrs. McCloud begged Mr. Joyner not to embarrass her by taking her back to her sister's house, but he would not listen.[16]

_____

[15] Mr. Joyner disputes this.  He says Mrs. McCloud gave consent for him to drive and that she voluntarily rode along.  The jury was entitled to credit Mrs. McCloud's testimony that she did not.  And hers seems the more plausible version.  Mrs. McCloud was being detained, as she was explicitly told an hour and a half earlier while the videotape was running.  Detainees are rarely allowed to drive.

[16] Again, these facts are disputed, and again, the jury was entitled to credit Mrs. McCloud's testimony.

Mr. McCloud and Mr. Frazier were transported to the King residence in the backseat of Mr. Clark's patrol car. Cynthia McCloud was taken in the backseat of Mr. Knecht's patrol car. None of the McClouds consented to being placed in the vehicles or to being taken to the King home. The McClouds had, instead, made clear that they wanted to leave.[17]

Upon arriving at the King residence, Mr. Joyner took Mrs. McCloud out of the car and took her with him as he approached the house. Mr. Joyner told Mrs. McCloud he would "tear the mother fucking house down" if she did not get it opened. Mr. Joyner covered his badge. He knocked. Mrs. McCloud's brother-in-law Bernard King answered the door. This record does not establish precisely what happened next, but within a short time officers were in the house and Mr. King was on the floor with an officer's knee in his back. Officers brought the residents into the living room, holding by the arms Chesley King, a 61-year-old stroke victim with limited mobility who was in his underwear with his genitals exposed. Officers brought Cynthia McCloud into the home but left Mr. McCloud and Mr. Frazier outside in the backseat of a patrol car. Officers conducted a

---

[17] This again is disputed. Mr. Joyner said Mrs. McCloud consented. Mr. Stinson said he heard Mrs. McCloud offer to take the officers to the King house to show them there was nothing there, but he said he told this to nobody else. Other officers said they heard from *someone* that the McClouds had consented to go to the King residence, but the officers could not remember who said this. The jury was entitled to credit plaintiffs' testimony that they did not consent.

thorough search of the home, including with the drug dog.  Mr. Joyner asked Ms.

King whether she allowed her sister to bring drugs into the house.  Mr. Joyner

cursed and made racist remarks.[18]

Officers say they found marijuana seeds and cocaine and marijuana residue

on a night stand but nothing more.  There was no evidence of drug dealing—no

scales, no baggies, no owe sheets, no drugs packaged for sale or even for personal

use.

No consent was given by anyone for the officers to enter or search the home.

Later, however, Mr. Knecht obtained Ms. King's signature on a written consent

form.  Mr. Knecht backdated the form to 2:45 (the approximate time of the original

entry).  One of the officers induced Ms. King to sign the form by telling her she

could either sign at the house or sign at the jail.[19]

---

[18] Most of the facts in this paragraph are disputed.  Mr. Joyner admitted that
he covered his badge as he approached the house, and officers admitted they made
a thorough search, including with the dog.  They admitted leaving Mr. McCloud
and Mr. Frazier in the back of a patrol car.  The remainder of the facts in this
paragraph come from the testimony of Ms. King and Mrs. McCloud.  A reasonable
juror could have credited their account.

[19] Mrs. McCloud said the officer who made this statement was Mr. Stinson,
but it was Mr. Knecht who signed the form.  The officers disputed the assertions
that the consent form was signed only after the fact and that consent was coerced.
Mr. Knecht testified he obtained the consent form precisely at the time indicated on
the form—2:45.  He said he took the time from his watch and recorded it
accurately.  He also said, however, that he was not present at the original entry.
Other officers testified the form was signed before anyone entered.  The officers'
accounts are conflicting, even among themselves.  A reasonable juror could have
credited Ms. King's testimony that she signed the form only under duress and only

At 4:04 the search was over, and the officers departed, releasing the Kings and McClouds.  The officers made no arrests at that time.  After the McClouds returned home, they retained an attorney, who made a public records demand on the Jefferson County Sheriff's Department for documents relating to the night's events.  Soon thereafter—the McClouds say in retaliation—criminal charges were filed against Mr. McCloud based on the controlled buy.  The charges were later dropped.  Defendants say the reason was the confidential informant's refusal to cooperate.

Plaintiffs, especially Cynthia, suffered substantial mental health damage from the night's event.  All have had counseling and need more.

## II.
## Proceedings

The plaintiffs in this action as originally filed were the four members of the McCloud family (Mr. and Mrs. McCloud, Cynthia McCloud, and Mr. Frazier) and the three members of the King family who lived at the residence that was searched (Barbara King, Bernard King, and Chesley King).  The original defendants were Jefferson County Sheriff Kenneth W. Fortune in his individual and official capacities and, in their individual capacities, the Jefferson County deputies involved in the searches (Messrs. Joyner, Hayes, Stinson, Knecht, and Clark), Mr.

---

after the search had been completed.

Norton (the Monticello police officer who participated in the controlled buy), and Ms. Anderson (the Leon County deputy who conducted the bodily searches of the McCloud women).[20]

All plaintiffs settled their claims against Mr. Norton.  The Kings also settled their claims against all other defendants.  The McClouds settled their claims against Ms. Anderson.  This left pending only the McClouds' claims against the Jefferson County defendants.

The McClouds sought to recover against the Jefferson County defendants under 42 U.S.C. §1983 for violation of the Fourth and Fourteenth Amendments (count 1), on state law theories of false imprisonment (count 4) and intentional infliction of emotional distress (count 5), and for conspiracy to violate civil rights (count 12).  Mr. McCloud also asserted claims against the sheriff and Mr. Hayes for malicious prosecution (count 2) and false arrest or imprisonment (count 3) based on the filing of criminal charges.  Mrs. McCloud asserted against all defendants claims of assault (count 6) and battery (count 7), as did Cynthia McCloud (counts 8 and 9), based on the searches of their persons.

A series of summary judgment rulings pared these claims.  *See* Orders of December 2, 2005, and January 11, 2006 (documents 114 & 128).  The rulings

---

[20] Also named, apparently in error, was Jefferson County deputy William L. Massey.  All claims against Mr. Massey were dropped early in the case.

included the following.  First, the stop of the car was lawful based at least on

probable cause to believe it was speeding, if not also probable cause to believe it

contained drugs.  Second, the McClouds were not unlawfully detained during the

consent search of their car.  Third, the detention of Mr. McCloud, even after the

consent search, was lawful, because officers had probable cause to arrest him for

sale of cocaine (that is, as a result of the controlled buy).  Fourth, the later filing of

criminal charges against Mr. McCloud was lawful because supported by probable

cause, regardless of the subjective motivation for the filing of the charges.  Fifth,

Messrs. Knecht, Stinson, and Clark could not be held liable for any unlawful

search of the person of Arnetta or Cynthia McCloud.[21]  Sixth, the officers' actions

did not constitute intentional infliction of emotional distress under Florida law.

Seventh, the conspiracy count, to the extent it stated a viable claim at all, was

---

[21] The basis of this ruling is set forth at some length in the Order Granting Summary Judgment in Part entered December 2, 2005 (document 114).  An oversimplified explanation is that the record as compiled at that time did not show that these officers (a) participated in or were in a position to prevent the searches (as required for liability under either state or federal law), and (b) had information sufficient under clearly established law to demonstrate that the searches of the women's persons were unconstitutional (as required to overcome the officers' qualified immunity defense under federal law or to hold the officers individually liable based on the bad faith standard applicable under state law).  The same ruling might not have been made based on the record as compiled at trial.  As it turns out, the searches of the women's persons came long after they should have been released.  Under clearly established law and the facts known to every Jefferson County officer on the scene, *any* unconsented search of the women at that time, including the simplest pat down, would have been unconstitutional, because they were being unlawfully detained.

redundant and properly dismissed on that basis.  Eighth, the sheriff himself (Mr. Fortune) had no involvement in the night's events and thus could not be held liable in his individual capacity.

These rulings left pending only the following claims:  first, the claims of Arnetta and Cynthia McCloud and Marcus Frazier against the sheriff (in his official capacity) and the five Jefferson County deputies (in their individual capacities) for detention after the conclusion of the search of the McCloud vehicle; and second, the claims of Arnetta and Cynthia McCloud (not Mr. Frazier) against the sheriff (in his official capacity), Mr. Joyner, and Mr. Hayes (not Messrs. Knecht, Stinson, or Clark) for unlawful search of their persons and assault and battery.  Mr. Fortune had left office, and the new sheriff (David C. Hobbs) was substituted for Mr. Fortune as the official capacity defendant.

The case proceeded to a six-day jury trial.  For a trial of this length involving allegations and factual disputes of this nature, it was an unusually clean trial. There were few if any evidentiary rulings of substance adverse to defendants and *none* of which defendants now complain.[22]  There were few if any rulings of

---

[22] In contrast, there were several significant evidentiary rulings *favorable* to defendants.  I admitted over objection evidence of the controlled buy.  I admitted over objection evidence that officers found marijuana seeds and marijuana and cocaine residue at the King house.  I sustained defendants' objection to evidence of (and the jury thus did not learn of) the filing and dismissal of criminal charges against Mr. McCloud.

substance adverse to defendants with respect to the instructions or verdict forms and *none* of which defendants now complain.

The claims were narrowed further, though not in respects that made any difference of substance, prior to and during the jury's deliberations.  First, the assault claim, which was based entirely on the searches of the persons of Arnetta and Cynthia McCloud, was not submitted to the jury at all, first because there was no evidence of an assault (as opposed to a battery), and second because even if what happened could be deemed an assault, the assault theory still would add nothing of substance; the assault theory would, instead, add a needless complication without affecting the ultimate decision on liability or damages.

Second, when during deliberations the jury sent the court a written question regarding battery, the battery claim was expressly withdrawn from the jury's consideration, with the consent of both sides.  This again made no difference; the battery theory added a needless complication without affecting the ultimate decision on liability or damages (because, as both sides agreed, any harmful touching of Arnetta or Cynthia McCloud during a search constituted a battery if and only if the search itself was unconsented and unlawful).

The jury returned its special interrogatory verdict for all plaintiffs against all defendants on all remaining issues.  The jury explicitly found that each plaintiff was detained without consent longer than reasonably necessary for a reasonable

search of the McCloud car.  The jury explicitly found that Arnetta and Cynthia

McCloud were subjected to unlawful searches of their persons without consent.

The jury explicitly found that all of this was done based on an official custom or

policy of the sheriff's department (thus rendering the sheriff liable in his official

capacity).  The jury explicitly found that all five deputies were responsible for the

unlawful detention, and that Messrs. Joyner and Hayes were responsible for the

unlawful searches of the person of Arnetta and Cynthia McCloud.  The jury found

that each individual defendant acted in bad faith or with malicious purpose or in a

manner exhibiting wanton and willful disregard of human rights (thus rendering

the individuals liable under state as well as federal law and authorizing an

assessment of punitive damages).[23]

 The jury assessed compensatory damages in favor of Mrs. McCloud of

$25,000 for counseling expenses and $60,000 for mental and emotional anguish or

personal humiliation.  The jury assessed compensatory damages in favor of

---

[23] Under state law, a single tortious act of a public employee renders the
employee individually liable (if he acts in bad faith, maliciously, or willfully and
wantonly) or renders the employing entity (in this case the sheriff in his official
capacity) liable (if the employee did not act in bad faith, maliciously, or willfully
and wantonly).  *See* Fla. Stat. §766.28.  Individual and entity liability for the same
act are mutually exclusive.  The same is not true under federal law; the individual
(if he violates clearly established law) and entity (if the violation is committed
based on an official policy or custom) may both be liable.  In the case at bar there
were multiple tortious acts.  The properly instructed jury found the facts necessary
for imposition of liability on both the entity and the individuals under both state
and federal law.

Cynthia McCloud of $25,000 for counseling expenses and $148,000 for mental and

emotional anguish or personal humiliation.  The jury assessed compensatory

damages in favor of Mr. Frazier of $12,000 for counseling expenses and $30,000

for mental and emotional anguish or personal humiliation.  The total compensatory

damage award thus was $300,000.[24]

The jury assessed punitive damages in favor of Arnetta McCloud of $45,000

against Mr. Hayes, $175,000 against Mr. Joyner, and $10,000 each against Messrs.

Stinson, Knecht, and Clark.  The jury assessed punitive damages in favor of

Cynthia McCloud in the amount of $250,000 against Mr. Hayes, $750,000 against

Mr. Joyner, and $100,000 each against Messrs. Stinson, Knecht, and Clark.  The

jury assessed punitive damages in favor of Mr. Frazier of $45,000 against Mr.

Hayes, $75,000 against Mr. Joyner, and $10,000 each against Messrs. Stinson,

---

[24] Defendants explicitly agreed to have damages assessed only in the general
categories recounted in the text above, without a further breakdown.  This reflected
a strategic decision—one defendants often make—that fewer opportunities for the
jury to fill in a blank with a damages number is better.  Had defendants so
requested, a further breakdown could have been obtained (for example, among
damages of Arnetta McCloud resulting from the roadside detention, search of her
person, and detention en route to and at the King residence).  Though at first blush
this might seem to matter—some of the individuals were not responsible for the
searches of the persons—the difference may be only theoretical, not real.  First, the
jury might well have concluded the damages were inseparable—that the entire
damage resulted from each of the components.  And second, if (as often occurs in
cases of this type) the damages awarded against all defendants will be paid from a
common source (typically a sheriffs self insurance fund), then choosing to have
damages assessed without a further breakdown was a reasonable strategic decision.

Knecht, and Clark.  The total punitive damages award thus was $1,700,000.  The combined total award for compensatory and punitive damages in favor of all three plaintiffs against all defendants was $2,000,000 even.

At my direction, the clerk entered judgment on the verdict.  Because the judgment did not explicitly dismiss the claims resolved prior to trial on which judgment had not been entered, I announced my intention to direct entry of an amended judgment explicitly resolving all claims among all parties.[25]

In the meantime defendants filed the instant motion for a new trial or remittitur.  They assert the verdict was not supported by sufficient evidence or was contrary to the weight of the evidence, that there was no basis for an award of punitive damages at all and that in any event the punitive damages awards were excessive, that plaintiffs' closing argument was inflammatory (though plaintiffs did not object and asked for no curative instruction at trial), that the court should have polled the jurors to determine whether they saw or were affected by media coverage (though there was no indication of this and no request for such a poll

---

[25] As is proper, the amended judgment that will now be entered will bear interest from the date of the original judgment.  *See, e.g., Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835-36, 110 S. Ct. 1570, 108 L. Ed. 2d 842 (1990) (noting that the purpose of postjudgment interest is to compensate the successful plaintiff for the loss of time between the ascertainment of damage and payment); *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1339-40 (11th Cir. 1999) (holding that interest runs from the entry of the original judgment on a verdict, even if the award is later reduced by remittitur and on appeal).

during the trial or upon return of the verdict), and that a forensic psychologist improperly mentioned a test not disclosed prior to trial as required by Federal Rule of Civil Procedure 26(a)(2) (defendants' objection was promptly sustained and the jury was told to disregard the testimony and why, but defendants say this was not enough). This order addresses each of defendants' contentions in turn.

## III.
## Sufficiency and Weight of the Evidence

Plaintiffs made no claim at trial that the stop and consent search of their car were improper in any way. Nor did plaintiffs claim they were unlawfully detained prior to completion of the search of the car. And had they made such a claim it would not have mattered; I ruled prior to trial and instructed the jury that the stop of the car, the search of the car, and the detention of the McClouds during the search of the car were proper. Plaintiffs' attorney said the same thing in his closing argument.

The issue, then, was simply whether plaintiffs were improperly detained against their will after the search of the car ended, and whether, while so detained, Arnetta and Cynthia McCloud were subjected to improper searches of their persons. These were easy issues, both on the facts and on the law. The jury (by its verdict) got the facts right, and the court (in its instructions) got the law right. That defendants made no relevant objections to the instructions is perhaps some confirmation that they accurately set forth the law. This order addresses first the

facts, then the law.

## A.

The evidence that plaintiffs were detained against their will after the search of the car ended was overwhelming. The search of the car ended by 1:09 a.m. When, shortly thereafter, officers decided to put the McClouds into the backseats of patrol cars, Mr. McCloud said they did not want to be put in the patrol cars; they wanted to go. An officer responded clearly and unequivocally, and the response was recorded on the videotape. It was not a question of "want to," the officer said; the McClouds were being "detained." Clearer evidence of a person's detention against his or her will would be difficult to find.

And even without the videotape, the evidence would remain strong. Plaintiffs all testified they did not consent to stay longer. Mrs. McCloud said she not only did not consent to be taken to the King residence but that she begged Mr. Joyner not to take her there and embarrass her in front of her sister.

Plaintiffs' testimony on this rang true. It was 1:09 a.m. on July 11 when the consent search of the car ended. The McClouds had left their south Florida home before dawn on July 10 and had been traveling (and visiting family) for some 20 hours. They had been stopped for going 49 in a 35 zone on a remote highway and had stayed during a consent search of the car (including with a dog) for more than half an hour. The suggestion that they voluntarily agreed to stay in the backseats

Case 4:05-cv-00101-RH-WCS   Document 219   Filed 01/25/07   Page 26 of 46

Page 26 of 46

of separate patrol cars for almost another hour and a half (until a little after 2:30) and then consented to go back to Mrs. McCloud's sister's house for a search that lasted until after 4:00 would be a stretch, even without the videotape evidence and unequivocal testimony to the contrary.  And during that time, even on defendants' version, 15-year-old Cynthia McCloud was subjected to the humiliation of pulling down her pants and underwear alongside the highway, in the presence of a female officer and not far from a number of male officers and her father, mother, and cousin.

Any assertion that there was insufficient evidence that plaintiffs were detained against their will, or that the jury's finding on this was contrary to the weight of the evidence, is plainly unfounded.

## B.

Nor is there any reasonable ground for disagreement on the applicable law. It is true, as defendants note, that the individual defendants were entitled to assert the defense of qualified immunity.  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986); *see generally Hope v. Pelzer*, 536 U.S. 730, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002); *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).  For qualified immunity purposes, the issue is not just the law as it now stands, but the clearly

Case No: 4:05cv101-RH/WCS

established law as of July 11, 2001, when the events at issue occurred.  The

applicable law, even then, was well settled.

When officers have lawful grounds to detain a person, the detention may

continue for only as long as reasonably necessary to effectuate the purpose of the

detention.  This proposition is obvious based on any basic understanding of the

Fourth Amendment, and the Eleventh Circuit has so held time and again, with

respect to both traffic stops and other types of detention.  Thus, for example, in

addressing a traffic stop, the Eleventh Circuit said:

> The Fourth Amendment protects individuals from unreasonable search
> and seizure.  A traffic stop is a seizure within the meaning of the
> Fourth Amendment.  *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct.
> 1391, 59 L.Ed.2d 660 (1979).  Because a routine traffic stop is only a
> limited form of seizure, it is more analogous to an investigative
> detention than a custodial arrest.  *See Berkemer v. McCarty*, 468 U.S.
> 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).  Therefore, we
> analyze the legality of these stops under the standard articulated in
> *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
> *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d
> 605 (1985); *United States v. Tapia*, 912 F.2d 1367, 1370 (11th
> Cir.1990); *United States v. Hardy*, 855 F.2d 753, 758 (11th Cir.1988).
> Under *Terry*, an officer's actions during a traffic stop must be
> "reasonably related in *scope* to the circumstances which justified the
> interference in the first place."  392 U.S. at 20, 88 S.Ct. 1868
> (emphasis added).  Furthermore, the *duration* of the traffic stop must
> be limited to the time necessary to effectuate the purpose of the stop.
> *United States v. Pruitt*, 174 F.3d 1215, 1219 (11th Cir.1999).  The
> traffic stop may not last "any longer than necessary to process the
> traffic violation" unless there is articulable suspicion of other illegal
> activity.  *United States v. Holloman*, 113 F.3d 192, 196 (11th
> Cir.1997).

*United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. Jan. 4, 2001) (emphasis in

original).

Other Eleventh Circuit decisions have long made clear that these same principles—that a detention must be "reasonably related in *scope* to the circumstances which justified the interference in the first place" and that the "*duration* of the [detention] must be limited to the time necessary to effectuate [its] purpose"—apply across the board, not just to traffic stops. Thus, for example, in *United States v. Codd*, 956 F.2d 1109 (11th Cir. 1992), officers had reasonable grounds to believe a woman might have information about, and might have aided and abetted, her husband's recent escape from federal prison. Officers learned the woman was at an airport and made a *Terry* stop. The Eleventh Circuit held the stop proper but suppressed evidence obtained after the *duration* of the stop became unreasonable.[26]

---

[26] Officers learned at noon that the woman was at an airport rental counter and by telephone asked the rental car agent to stall the woman. At 1:00 p.m. officers arrived and made inquiries of the woman—a classic *Terry* stop. They eventually searched her purse and found incriminating evidence. After further delay they arrested her. The arrest occurred at 2:30 p.m. The court's opinion does not indicate the maximum permissible duration of a *Terry* stop, but the court's holding was that the limit was exceeded prior to the search of the purse. *See also United States v. Place*, 462 U.S. 696, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983) (disapproving *de facto* detention for 90 minutes); *United States v. Hardy*, 855 F.2d 753 (11th Cir. 1988) (upholding 50-minute *Terry* stop based on specific need for delay of that length and citing *Place* for proposition that 90 minutes is probably too long). As all of these cases recognize, the length of a permissible detention may vary depending on the facts, but when the legitimate purpose of the detention has been fully satisfied, further detention is improper.

The legitimate purposes of the officers' stop and detention of the McClouds included issuing a speeding ticket or warning, checking Mr. McCloud's license and the vehicle's registration, and searching the car (based on consent, if not also based on reasonable suspicion or probable cause to believe it contained drugs). By 1:09 a.m. all of that was done. There was no lawful basis to hold plaintiffs any longer. This was so as a matter of clearly established law. No reasonable officer could have thought otherwise. That is, in a nutshell, all the law one needs to know to resolve this case.

This conclusion is fully consistent with cases recognizing that an officer may pat down for weapons any person who is legitimately stopped or detained—even if based only on reasonable suspicion—and who the officer reasonably believes might be armed. *See, e.g., Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). The reason for the rule is clear: an officer with reasonable grounds to stop and inquire of a person ought not have to risk his or her life to do so. As *Terry* explicitly recognized, however, such a pat down "must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." 392 U.S. at 26. *Terry* does not authorize holding an individual after the reasonable inquiry has ended. When the inquiry ends, the answer to officer safety concerns is to let the person go, not to hold the person longer so that a search can be conducted.

In the case at bar the officers have acknowledged that they had no basis to believe plaintiffs might be armed, a fact confirmed by their failure to conduct any pat down prior to 1:09. And even if a pat down for weapons would have been proper prior to 1:09, the officers were not entitled to hold plaintiffs longer, just so they could conduct a pat down. Nothing in *Terry* authorizes holding individuals after a traffic or investigatory stop ends for the very purpose of conducting a further search. Any suggestion that individuals could be detained for this purpose would stand *Terry* on its head.

This was, nonetheless, the theory on which some of the officers say they were proceeding on the night at issue. The officers testified they had no probable cause for a full search of the individuals but said they were entitled to conduct a "pat search," presumably a reference to *Terry*. On this, however, the officers meet themselves coming and going. The officers admitted they were not concerned for officer safety or weapons; they were looking for drugs. And they could hardly have said otherwise; if the goal was officer safety, the pat down should have been conducted much earlier. A male officer need not wait for a female officer to conduct a pat down for weapons; officer safety ordinarily cannot wait (the whole point of *Terry*). The officers' invocation of *Terry* as a basis for holding plaintiffs after 1:09 represents a complete misreading of that decision, which, as quoted above, authorized a pat down only *for weapons* and only *during*, not *after*, a lawful

stop or detention.

A more extensive search may go forward only if supported on other grounds—for example, based on probable cause or incident to a lawful arrest.  No such grounds were present in the case at bar, as defendants seemingly admit. There was probable cause to believe *Mr. McCloud* committed a crime some hours earlier, and there is an argument (albeit weak) that there was probable cause to believe *Mr. McCloud* would be transporting drugs to Tallahassee (the informant may have said so, though the basis of his information was unclear, and its reliability, uncertain from the outset, eroded substantially when the car was searched and no drugs were found).  But this provided no basis for searching *plaintiffs*.  An individual's presence at the scene of unlawful conduct by others does not alone provide probable cause for a search or seizure of that individual. *See, e.g. Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S. Ct. 338, 62 L .Ed. 2d 238 (1979) ("Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person.").

To be sure, the officers had not found any drugs in the car or on Mr. McCloud, and their subjective belief was that there were drugs somewhere, perhaps on one of the plaintiffs or back at the King residence.  This did not, however, provide a basis for the officers to detain plaintiffs after completion of the search of the car at 1:09.  This is so for three reasons, each of which would be

sufficient standing alone to require this result.

First, an officer's subjective belief is not a sufficient basis for detaining or searching an individual.[27]  As set forth above, the legitimate scope and duration of any *Terry* stop had ended.  The officers had no cause to believe that *plaintiffs*—as opposed to Mr. McCloud—had sold or possessed drugs.  The officers had no information suggesting plaintiffs knew Mr. McCloud had sold or possessed drugs (if he had).  When the extensive search of the car and Mr. McCloud turned up no drugs, the most reasonable explanation was that the informant's prediction that Mr. McCloud would be transporting drugs (if indeed the informant said this) was wrong, not that the drugs were in the possession of plaintiffs, about whom the informant provided no information at all.  And officers had even less basis to believe there were drugs inside the underwear of Mr. McCloud's 15-year-old daughter.  Although officers made assertions that night that the drug dog alerted to the location where Cynthia McCloud had been sitting, that was not so.  Indeed, to the extent it proves anything, the officers' reliance on an alleged alert at that location simply shows that they were either dishonest or more than a little sloppy; it is uncontested that the dog did not in fact alert at that location.

Second, even if it somehow could be concluded that the officers had grounds

_____

[27] One of the officers testified he could detain any person based on a subjective belief or feeling the person had committed a crime.  Clark Tr. (document 206) at 19.  This of course is not the law.

to search one or all of the plaintiffs, this still would not support their detention after 1:09. The stop occurred at 12:30. By 1:09, when the search of the vehicle was over, there had been more than enough time to search the individuals. Mr. Frazier was searched promptly thereafter, by about 1:15. Inexplicably, the McClouds were held at the roadside for more than another hour. The delay resulted partly from the notion that a search of Arnetta and Cynthia McCloud could be conducted only by a female officer.[28] But the decision to summon a female officer does not explain much of the delay; it was not until 1:47 that officers placed a call to Leon County asking for the assistance of a female officer. Defendants have offered no explanation at all for the delay of some 38 minutes between the conclusion of the vehicle search (at 1:09) and the placement of a call for a female officer (at 1:47). In short, even if officers had grounds to search plaintiffs individually, and even if they reasonably could have awaited the arrival of a female officer, the duration of this detention was unconstitutional.

Third, there is absolutely no theory that would support detention of plaintiffs after 2:29, when the searches of their persons were complete. If, as the jury found

---

[28] There was no basis for awaiting a female officer to conduct a pat down. That is all the officers say they intended. If, contrary to their testimony, they intended a strip search, then awaiting a female officer would have made more sense—but on that view, conducting the search alongside a public highway would have violated clearly established law, perhaps explaining defendants' insistence that no search of this nature was intended or occurred.

based on credible evidence, plaintiffs were held against their will after that time, it was unconstitutional as a matter of clearly established law.  The Constitution simply does not allow the arrest of an entire family based on evidence that, at an earlier time, the father committed a crime.  *See, e.g., United States v. Di Re*, 332 U.S. 581, 594, 68 S. Ct. 222, 92 L. Ed. 210 (1948) ("[A]ny inference that everyone on the scene of a crime is party to it must disappear if the government informer singles out the guilty person.").[29]

In sum, there was no basis for detaining anyone other than Mr. McCloud after 1:09 a.m. and even less basis for detaining them after 2:30.  Holding plaintiffs until after 4:00 was unconstitutional.[30]

## IV.
## Punitive Damages

---

[29] *Maryland v. Pringle*, 540 U.S. 366, 124 S. Ct. 795, 157 L. Ed. 2d 769 (2003), is not to the contrary.  There officers found drugs in a car and had no information regarding which of the occupants the drugs belonged to.  The Court held this provided probable cause to arrest them all.  In the case at bar, in contrast, officers found no drugs in the car, and even if they had found the drugs they thought would be there, the case still would be like *Di Re*, not *Pringle*, because the informant had identified the guilty party.

[30] Defendants explicitly chose not to have the jury break down damages for different periods of detention (for example, as between detention at the roadside, on the one hand, and detention at the King residence, on the other hand) or among different groups of defendants (for example, as between the groups of defendants who were or were not responsible for the searches of the persons of Arnetta and Cynthia McCloud).  *See supra* note 24.  The verdict thus must stand if supported on any theory of liability.  In fact, the verdict is supported on every theory submitted to the jury.

The Supreme Court has made clear that in appropriate circumstances, punitive damages may be awarded in an action arising under §1983:

> We hold that a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.

*Smith v. Wade*, 461 U.S. 30, 56, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983); *see also Wright v. Sheppard*, 919 F.2d 665 (11th Cir. 1990).  Punitive damages also are available for the tort of false imprisonment under Florida state law.

The case at bar was a classic case for an award of punitive damages. Officers held plaintiffs against their will for hours with no colorable basis for doing so.  The only justification now offered—that plaintiffs consented—is simply not true.  And one officer, Mr. Joyner, was abusive and made racist remarks.  When, as here, there is a deliberate violation of constitutional rights, a jury properly may, if it chooses, award punitive damages.

The amount of punitive damages awarded by the jury was within acceptable limits.  Relevant factors include the degree of reprehensibility of the defendant's misconduct; the ratio between actual and punitive damages; and sanctions for comparable misconduct.  *See BMW of North America, Inc. v. Gore*, 517 U.S. 559, 576-84, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996); *see also State Farm Mut. Auto. Ins. Co. vs. Campbell*, 538 U. S. 408, 123 S. Ct. 1513, 155 L. Ed. 2d 585(2003); *Bogle v. McClure*, 332 F.3d 1347, 1359-62 (11th Cir. 2003).

Here defendants' conduct was reprehensible and caused substantial actual damages.  The plaintiffs have undergone, and will continue to need, significant mental health counseling.  Mr. Joyner's conduct was the most reprehensible; it was he who made racially derogatory remarks, commandeered the McCloud vehicle, and was the final decision maker for the most serious violations.  Mr. Hayes made the clearly unconstitutional decision to detain plaintiffs when the search of the car concluded at 1:09.  While the conduct of Mr. Stinson, Mr. Knecht, and Mr. Clark was not as reprehensible, they all participated fully in a prolonged course of unconstitutional conduct.  The jury found, with abundant support in the evidence, that all acted in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights.[31]

The ratio of punitive to compensatory damages as assessed by the jury was in every instance reasonable.  Indeed, in only two instances did a punitive damages award exceed a plaintiff's compensatory award.  The ratio of punitive to compensatory damages in favor of Cynthia McCloud against Mr. Joyner was 4.3 to 1, and the ratio of punitive to compensatory damages in favor of Cynthia McCloud

---

[31] Defendants have suggested that in his closing argument, plaintiffs' attorney abandoned any claim for punitive damages against Messrs. Stinson, Knecht, and Clark.  That is not so.  Plaintiffs' attorney argued that the jury should assess punitive damages at least against Messrs. Joyner and Hayes, but that statement hardly constituted an abandonment of the claim for punitive damages against the others.  Good attorneys often emphasize their stronger claims and often seek not to come across as overreaching.  Plaintiffs' attorney did nothing more.

against Mr. Hayes was 1.4 to 1.  In each other instance the ratio of punitive to compensatory damages was less than 1 to 1.[32]

Finally, there is no basis for concluding that this jury's award of punitive damages was out of line with sanctions for comparable misconduct.  In *Romanski v. Detroit Entertainment, L.L.C.*, 428 F.3d 629 (6th Cir. 2005), the Sixth Circuit addressed a wrongful detention far less egregious than that involved in the case at bar.  The court canvassed the applicable law and concluded that the highest permissible award of punitive damages in favor of the single plaintiff, who was detained in a casino during the day without cause and suffered actual damages of less than $280, was $600,000.  The court therefore remitted the jury's $875,000 award.  Though the court's approval of a $600,000 award was based in part on the defendant casino's revenues—a factor not present in the case at bar—in all other respects the case at bar presents a far stronger case for a far larger award of punitive damages.  When compared to a $600,000 award to a single plaintiff detained during the day in a casino, an award of an aggregate total of $1,300,000 in

_____

[32] Punitive damages are properly assessed against individual defendants individually; they are not awarded jointly and severally against multiple defendants together.  The individually calculated ratios set forth in the text thus are relevant for purposes of assessing the awards.  Moreover, even the overall ratio of punitive damages (against all defendants combined) to compensatory damages was within acceptable limits.  For Mrs. McCloud, the ratio was 2.9 to 1.  For Cynthia McCloud, the ratio was 7.5 to 1.  For Mr. Frazier, the ratio was 3.6 to 1.  For all plaintiffs combined against all defendants combined, the ratio was 6.7 to 1.

favor of three plaintiffs against five officers who detained them after midnight for hours on a remote highway seems, if anything, less severe, especially when one considers the substantial aggravating factors present in the case at bar—the racist remarks of the officer in charge, the searches of the person of the female plaintiffs alongside a public (if remote) highway, the commandeering of plaintiffs' car, and the forced return to (and search of) the home of relatives in the dead of night.

One final point should be made concerning the amount of these punitive damages awards.  Defendants chose not to join issue at trial on the subject of the appropriate amount of any award of punitive damages.  Defendants presented no evidence on this issue and made virtually no argument.  After the trial was over and the verdict in, each defendant proffered an affidavit claiming a limited net worth.  The time for presentation of that evidence, however, was during the trial. A defendant who wishes to seem confident of outright victory on the issue of liability, or who wishes to appear confident that the jury will award no punitive damages at all, may elect not to present evidence on or argue regarding the appropriate amount of any punitive damages award.  That is the strategy defendants chose here.  Defendants have not waived their claim that this award was excessive, constitutionally and otherwise, nor have they forfeited their claim for a remittitur.  Their after-the-trial proffer of evidence, however, comes too late.  So do arguments that were not made to the jury, except to the extent of the court's

proper role in reviewing the verdict, considering the request for a remittitur, and ensuring fidelity to constitutional limits.

In sum, the jury's substantial award of punitive damages in favor of each plaintiff against each defendant was supported by the evidence, was reasonable in amount, and comported with constitutional standards.

## V.
## Closing Argument

After defendants presented closing argument that plaintiffs' attorney, at least, interpreted as a suggestion that some defendants were merely doing as instructed by their superior officers and should be exonerated on that basis, plaintiffs' attorney said in rebuttal that an officer is not entitled to follow an order to violate a person's constitutional rights.  Plaintiffs' attorney said this had been true from the days of the Nuremberg trials, to Abu Ghraib, and over a long history. Defendants did not object.

Defendants now say, however, that this argument was so inflammatory that it warrants a new trial, even in the absence of any objection.  I disagree.

First, an attorney ordinarily may refer in closing argument to well known events or institutions that are part of any juror's common understanding, so long as the reference is not misleading or inflammatory.  When an attorney accurately explains that following unlawful orders is not without more a defense, many jurors would immediately recognize—even without being told—that the same principle

was applied at Nuremberg and in the trials of offenses committed at Abu Ghraib.

That an attorney explicitly makes the connection, in order to illustrate the point,

seems unexceptional.

Second, even if the reference could be deemed improper, it would provide

no basis for a new trial.  This fleeting reference was an insignificant part of the trial

and plainly made no difference.  In asserting the contrary, defendants are grasping

at straws.[33]

## VI.
## Exposure to Media Coverage

Defendants say a new trial should be granted because the court did not poll

the jurors to determine whether they were exposed to and affected by media

coverage of the trial.  There is absolutely no basis, however, to believe the jurors

saw or were affected by any such coverage.  I instructed the jurors before the trial

began and repeatedly during the trial not to see or hear or read any media coverage.

I explained that the reason was that the jurors were to decide the case based on the

evidence presented during the trial, not based on anything they might hear or see or

---

[33] An institutional interest should be noted as well.  If a new trial would properly be ordered based on so fleeting and inconsequential a reference, any district judge wishing to try a case once rather than twice would need to develop a hair trigger, interrupting closing arguments at the slightest hint of impropriety, even without an objection, and giving curative instructions that might highlight rather than downplay the argument.  This would serve the interests of nobody—including the attorney who might choose, as defendants' attorney chose, to remain silent rather than make an objection.

read in the media.  There was never so much as a hint that any juror disregarded these instructions.

Defendants made no request during the trial for any inquiry to the jurors on whether they had complied with my instructions.[34]  When the verdict was returned and the jurors were individually polled—by being asked, in accordance with the court's standard practice, whether this was indeed their verdict—defendants made no request that the jurors also be asked whether they had seen or been affected by any media coverage.

Defendants' assertion that the jurors should have been polled on the issue of media exposure is unfounded on the merits.  *See Gordon v. United States*, 438 F.2d 858, 871-74 (5th Cir. 1971).  Moreover, the assertion comes too late.  On issues of this type, when a party chooses to stand silent and hear the verdict, and chooses not to ask for a poll on the issue after the verdict is announced but before the jury is discharged, the party waives the objection, at least to the extent based on the same facts (or, as in this case, the same speculation) known to the party at that time.

## VII.
## Expert Testimony

---

[34] This is, at least, my recollection.  In the absence of a transcript, I cannot be certain no such request was made.  Had defendants made such a request without any reason to believe any juror had seen or been affected by any media coverage, I might well have denied it, on the theory that polling the jurors might have done more harm than good.  *See Gordon v. United States*, 438 F.2d 858, 872 & n.39 (5th Cir. 1971).

Plaintiffs introduced the testimony of Dr. Charles Madsen, a forensic psychologist, on the issue of damages.  Dr. Madsen testified that plaintiffs suffered psychological and emotional effects from the events of July 11, 2001, including post traumatic stress disorder, anxiety, and depression.  He said plaintiffs needed additional mental health counseling.  All of this testimony was fully disclosed in the report filed well prior to trial pursuant to Federal Rule of Civil Procedure 26(a)(2).  All of this testimony came in without objection.[35]

One contested issue did arise during Dr. Madsen's testimony.  He started with Mrs. McCloud.  After giving his overall opinion of her condition, Dr. Madsen said Mrs. McCloud's "SIRS" score—the result of a diagnostic tool known as the "Structured Interview for Reported Symptoms"—was 26.  He said individuals with mental illnesses typically had SIRS scores of 22 to 52.  He said Mrs. McCloud's results indicated she was honest on six of seven verification scales but probably had been fudging on one.  Defendants made no objection to this testimony when it was offered.

Dr. Madsen then turned to Cynthia McCloud.  After giving his overall opinion of her condition, Dr. Madsen began to describe her SIRS results.  Defendants objected.  With the jury out of the courtroom, defendants asserted that

---

[35] The testimony was not all one-sided.  On cross-examination Dr. Madsen said plaintiffs' symptoms also were consistent with the harm that might result from learning a close family member was involved in drug dealing.

Dr. Madsen's Rule 26(a)(2) report did not include any reference to SIRS results. Plaintiffs acknowledged this was so. I sustained defendants' objection to and motion to strike any testimony about SIRS and told the jurors, upon their return to the courtroom, that they should disregard all SIRS testimony because plaintiffs had failed to disclose the SIRS evaluation as required by the governing court rules.

I did not, however, declare a mistrial. In the overall context of this trial, the brief references to SIRS were insignificant, especially in light of the curative instruction. The assertion that this testimony harmed defendants or affected the verdict is fanciful. Declaring a mistrial on this basis would have been an exceptionally poor exercise of discretion.

As an aside, it bears noting that, so far as this record reflects, the omission of the SIRS results from the Rule 26(a)(2) report produced a double windfall for defendants. First, evidence that was probative (at least so far as this record reflects) and plainly admissible (so long as properly disclosed in advance) was excluded. Second, the jury was told by the judge that plaintiffs had violated the rules. If this incident had any net effect, it almost surely was in favor of defendants; the benefit defendants reaped from the instruction probably exceeded, and at least was sufficient to offset, any slight harm that might have resulted from the brief references to SIRS.

The references to SIRS do not warrant a new trial.

# VIII.
## Conclusion

This was a full and fair trial.  The weight of the evidence supported the jury's verdict.  The jury's assessment of damages was reasonable.  Accordingly,

IT IS ORDERED:

1.  Defendants' motion for a new trial or remittitur (document 184) is DENIED.

2.  The clerk shall enter an amended judgment stating:

Plaintiff Arnetta McCloud shall recover the sum of Eighty-Five Thousand Dollars ($85,000) as compensatory damages from defendants David Hobbs (in his official capacity as Sheriff of Jefferson County, Florida), William D. Hayes, George Stinson, Gerald Knecht, David Clark, and Michael Joyner, jointly and severally.

Plaintiff Arnetta McCloud shall recover the sum of Forty-Five Thousand Dollars ($45,000) as punitive damages from defendant William D. Hayes.

Plaintiff Arnetta McCloud shall recover the sum of Ten Thousand Dollars ($10,000) as punitive damages from defendant George Stinson.

Plaintiff Arnetta McCloud shall recover the sum of Ten Thousand Dollars ($10,000) as punitive damages from defendant Gerald Knecht.

Plaintiff Arnetta McCloud shall recover the sum of Ten Thousand Dollars ($10,000) as punitive damages from defendant David Clark.

Plaintiff Arnetta McCloud shall recover the sum of One Hundred Seventy-Five Thousand Dollars ($175,000) as punitive damages from defendant Michael Joyner.

Plaintiff Cynthia McCloud shall recover the sum of One Hundred Seventy-Three Thousand Dollars ($173,000) as compensatory damages from

defendants David Hobbs (in his official capacity as Sheriff of Jefferson County, Florida), William D. Hayes, George Stinson, Gerald Knecht, David Clark, and Michael Joyner, jointly and severally.

Plaintiff Cynthia McCloud shall recover the sum of Two Hundred Fifty Thousand Dollars ($250,000) as punitive damages from defendant William D. Hayes.

Plaintiff Cynthia McCloud shall recover the sum of One Hundred Thousand Dollars ($100,000) as punitive damages from defendant George Stinson.

Plaintiff Cynthia McCloud shall recover the sum of One Hundred Thousand Dollars ($100,000) as punitive damages from defendant Gerald Knecht.

Plaintiff Cynthia McCloud shall recover the sum of One Hundred Thousand Dollars ($100,000) as punitive damages from defendant David Clark.

Plaintiff Cynthia McCloud shall recover the sum of Seven Hundred Fifty Thousand Dollars ($750,000) as punitive damages from defendant Michael Joyner.

Plaintiff Marcus Frazier shall recover the sum of Forty-Two Thousand Dollars ($42,000) as compensatory damages from defendants David Hobbs (in his official capacity as Sheriff of Jefferson County, Florida), William D. Hayes, George Stinson, Gerald Knecht, David Clark, and Michael Joyner, jointly and severally.

Plaintiff Marcus Frazier shall recover the sum of Forty-Five Thousand Dollars ($45,000) as punitive damages from defendant William D. Hayes.

Plaintiff Marcus Frazier shall recover the sum of Ten Thousand Dollars ($10,000) as punitive damages from defendant George Stinson.

Plaintiff Marcus Frazier shall recover the sum of Ten Thousand Dollars ($10,000) as punitive damages from defendant Gerald Knecht.

Plaintiff Marcus Frazier shall recover the sum of Ten Thousand

Dollars ($10,000) as punitive damages from defendant David Clark.

Plaintiff Marcus Frazier shall recover the sum of Seventy-Five Thousand Dollars ($75,000) as punitive damages from defendant Michael Joyner.

All of these amounts shall bear interest from and after March 31, 2006 (the date of the original judgment for damages) as provided by law.

All other claims asserted at any time in this action are dismissed with prejudice, provided, however, that the court reserves jurisdiction to assess costs and attorney's fees (including non-taxable costs) as may be appropriate and to enforce any settlement agreement entered among parties to this action.

3.  The clerk shall close the file.

SO ORDERED this 25th day of January, 2007.

s/Robert L. Hinkle_____
Chief United States District Judge